Filed 1/7/14  In re P.P. CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re P.P. et al., Persons Coming Under the Juvenile Court Law. | B246640 (Los Angeles County Super. Ct. No. CK88529) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. Susie P., Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County. Marguerite D. Downing, Judge.  Affirmed.

Roland M. Koncan, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, James M. Owens Assistant County Counsel, and Jacklyn K. Louie, Deputy County Counsel, for Plaintiff and Respondent.

_____

Susie P. (mother) appeals the jurisdictional and dispositional orders in the dependency case related to her children, P.P., R.P. and C.P. (collectively minors). We find no error and affirm.

**FACTS**

*The minors*

P.P. was born in June 2010, R.P. was born in May 2011, and C.P. was born in June 2012.

*2010 through mid-2012*

Mother did not obtain prenatal care for P.P., and she tested positive for marijuana during her pregnancy. At birth, P.P. also tested positive for marijuana. A referral was initiated. However, it was closed due to inconclusive evidence of neglect. On July 1, 2011, the Department of Children and Family Services (Department) filed a Welfare and Institutions Code section 300[1] petition on behalf of P.P. and R.P., but it was not adjudicated. That petition alleged that mother and R.P. had positive toxicology screens for marijuana after R.P.'s birth. The family was offered voluntary family maintenance services.

Social workers had difficulty providing mother, father and the minors with voluntary services because they were transient and resistant. The minors were detained due to the lack of compliance with voluntary services and placed with parental relatives, but then the juvenile court returned the minors back to the custody of their parents. When the parents were offered voluntary services a second time, they declined. According to the Department, mother tested positive for cannabinoids on May 13, 2011, June 9, 2011, and August 10, 2012. She was a no show for 14 drugs tests between May 2011 and February 2012. Father tested positive for cannabinoids on September 12, 2011, and was a no show for all tests through March 8, 2012. The 2011 dependency case was eventually closed.

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

While pregnant with C.P., mother did not obtain prenatal care. At the time of C.P.'s birth, mother refused drug testing for herself and C.P.

*The referral and investigation*

A hospital risk manager called in a referral on August 2, 2012, stating that mother recently gave birth to a baby. She had returned to the hospital after the birth and demanded $10,000 due to mistreatment by the hospital. She said she was not given the proper epidural; during the delivery of C.P., the hospital staff was too forceful with mother; and she had been forced to breast feed. In addition, she claimed that she was writing 11 books and that she speaks 12 languages. At the time, she was living in a hotel, had no income and said she could not care for the minors. The reporting party described mother's thinking as bizarre and suspected that she might be suffering from postpartum depression with psychotic features.

A social worker attempted to make face-to-face contact with mother on August 6, 2012, at her last known address, which was a motel. The manager reported that he evicted the family in March 2012 because they smoked in the room and would never allow the room to be cleaned. Soon after, the social worker made contact at a different motel. Mother denied having a mental health problem. She admitted that father and she still used marijuana, but she claimed that their use was medical and showed the social worker a medical marijuana license. Regarding their marijuana use, she claimed that father and she did not smoke at the same time and one of them was always available to watch the minors.

The social worker conducted a body check on P.P., who was two years old. He had dry skin with small dots on it. Mother said that P.P. had eczema.

On August 27, 2012, a social worker made an unannounced visit to the family at 11:00 a.m. It took 10 minutes for the family to answer the door. The home smelled like smoke and the social worker saw that incense was burning. She informed mother and father that they had tested positive for marijuana. Because their medical marijuana licenses had expired, the social worker informed mother and father that they would have to refrain from smoking until they were able to obtain new medical marijuana licenses.

3

They said that once they renewed their licenses they would continue to smoke. Mother denied that she might have mental health problems by stating that it was not bizarre that she spoke several languages and was writing books. In response, the social worker explained that the investigation was ongoing and that a third party would have to complete an assessment. During the visit, the social worker observed that there was laundry powder on the carpet, the minors' hair had a waxy residue, and the soles of their feet were dirty. The room was warm despite the family's use of two fans, and mother, father and the minors were sweating.

Another unannounced visit occurred on September 27, 2012. Mother exhibited her new medical marijuana license. It appeared to the social worker that the minors wandered around the home without supervision. There were two large trash bags containing empty beer cans in the room. After P.P. picked up one of those beer cans and threw it at the social worker, the social worker spoke to mother about picking up the trash bags and taking them outside. In response, mother got upset. She pushed the social worker out the door and claimed that the social worker had been outside spying. Because mother's anger had elevated, and because she was acting paranoid, the social worker did not feel safe and left.

The following month, the social worker transported mother to complete an Up Front Assessment with Dr. George Meza. Mother was guarded during the interview and would not talk about anything other than her experience at the hospital where she gave birth to C.P. Dr. Meza reported that mother displayed grandiose behavior and that, according to mother, her typical day consists of being at home all day and then drinking and getting high from 8:00 p.m. to 10:00 p.m. According to mother, she was reported to the Department because she filed a grievance against the hospital where C.P. was born. She claimed, "They reported me because I could read" and stated that she did not want to breast feed "because my ancestors are from Africa and it is against my religion, but they made me breast feed anyway." Mother said that she has used marijuana on a regular basis for four years, and that she used it to manage chronic foot, hand and back pain. In the prior 30 days, she reported that she had used marijuana only three times. She

4

minimized her use of medical marijuana and said it was her right to use the substance. Mother said she planned on homeschooling the minors. Dr. Meza pointed out that the minors would need socialization activities, and Mother replied, "I am their friend."

Dr. Meza's diagnostic impression under the DSM-IV was "Psychosis Disorder NOS" and "Cannabis Abuse."

During the investigation, P.P., R.P. and C.P. were found to be dirty on several occasions. They underwent forensic examinations. P.P. had a hyperpigmented pattern mark on the right thigh. Nonaccidental trauma could not be ruled out. He also had small hyperpigmented marks, likely due to old insect bites, and a small abscess on his left buttock. R.P. had "irritant contact diaper rash on vulva and redness around the anus. Multiple hyperpigmented small marks, likely due to old insect bites." The results for C.P. were normal.

When a dependency investigator interviewed the family, they were living in a one-room motel room. There were holes in the walls that led to electrical cords. Cockroaches crawled out of the television.

*The dependency petition*

On November 16, 2012, the Department filed a petition pursuant to section 300, subdivision (b). The petition alleged that mother and Christopher P. (father) are current abusers of marijuana, which renders them incapable of providing regular care for the minors. A count was added to allege that mother has a preliminary diagnosis of Psychotic Disorder NOS, and her mental health is an additional reason she cannot provide the minors with regular care.

In the detention report, the Department opined that there was a substantial danger to the physical or emotional health of the minors, and the family was categorized as having a high risk for future abuse or neglect because there were two prior investigations for neglect; the household previously received court voluntary services; and a primary caregiver has a problem with marijuana. In the detention report, the Department noted that "[r]esearch shows that marijuana slows response time, sensory reactions, and cause[s] drowsiness. Individuals that use marijuana on a consistent basis tend to have

5

side effects . . . while under the influence which creates a barrier when parenting young children that are unable to care for themselves."

Based on the risk to the minors, the Department recommended a family maintenance case be opened "in order to supervise the family and ensure that mother and father participate in court ordered services such as substance abuse treatment, random drug testing, counseling, and parenting [classes]."

*Detention; placement*

The minors were detained.

While at the Department offices awaiting placement, P.P. and R.P. displayed unusual behavior that was indicative of either an attachment disorder or mimicry of mother and father.  P.P. had matted hair with fleas in it.  The minors were placed in separate foster homes.

A social worker observed P.P. in his placement.  He was sitting very close to a television, suggesting he had a problem with his vision.  The foster parent said P.P. was sometimes aggressive when playing with other children.

*Jurisdiction and disposition report*

The Department reported that mother had exhibited erratic and bizarre behavior to social workers and Department staff.  For example, she claimed that the dependency case was retribution for the grievance she filed against the hospital.  She called law enforcement to report that the foster parents had cut P.P.'s hair, and that the haircut was against mother's religion.  Even though mother was told that P.P.'s hair was cut because it was matted and had fleas in it, mother continued to call the Department and demand to know why P.P.'s hair had been cut.  When speaking to the minors on the phone, mother had extreme emotional reactions.  At one point, mother was told that R.P. self-inflicted a bruise on her forehead and was given medical treatment.  Nonetheless, mother called law enforcement to report the incident and repeatedly called the Department to demand an explanation for the bruise, and to demand that R.P. receive medical attention.  In her repeated phone calls, mother demanded to know the location of the minors even though

6

she and father had been informed.  Mother displayed low memory, distractibility, rapid speech and delusional thoughts.

In foster care, P.P. was withdrawn and R.P. displayed severe behavior to the point of inflicting self-harm.

In November 2012, father was interviewed by a dependency investigator.  Father reported that he smokes marijuana for medical reasons, and that he usually smokes about three times a week and takes one or two hits from a "blunt until the pain is gone."  He said there was no lingering high.  He kept marijuana on a TV tray which was bolted to the wall about five feet off the ground.

*Jurisdictional hearing; disposition*

The parties convened for the jurisdictional hearing on December 11, 2012.  The juvenile court received the Department's reports into evidence and heard the testimony of a dependency investigator.

After closing argument, the juvenile court stated that "the issue in this case is not whether or not the parents use marijuana, it's about the [effect of their] marijuana [use], their ability to parent.  [¶]  In this case, it's clear both parents use marijuana . . . when and if they want to with no schedule."  It concluded that the Department met its burden of showing that mother and father were providing care to the minors while under the influence of marijuana.  This conclusion was based on the parents' positive drug tests, and also their missed drug tests.  Additionally, the juvenile court noted that father leaves his marijuana on a shelf in a motel room that the family shares, and the marijuana is accessible to the minors.  Then the juvenile court stated:  "The [minors'] level of care has been affected by the parents' use of marijuana.  The [minors] were dirty when recovered. . . .  [P.P.] had an abscess that had not been handled.  [C.P.] had a diaper rash that was severe.  The mother has bizarre behavior, which is a concern that she may have post partum depression with psychotic features or it's because of her marijuana [use].  The motel room was dirty.  There is evidence that they were previously kicked out because of their marijuana [use].  The room smelled like marijuana.  The parents refused

7

to test.  The parents continue to use.  There's a concern that [P.P.] is under weight, has developmental delays."

The juvenile court sustained the section 300 petition and declared the minors dependents.  It found by clear and convincing evidence pursuant to section 361, subdivision (c) that there was a substantial danger to the physical and emotional well-being of the minors if they were returned home, and that there were no "reasonable means to protect them without removing them from their parents' custody."  The juvenile court noted that mother requested a home of parent order and then stated:  "The court detained these [minors] [even though the Department was] willing to allow the [minors] to remain in the home.  . . . [T]he court's view is that the parents' attitude was we're going to smoke marijuana and too bad, so sad, we have medical [licenses], and our kids will just be as we choose for them to be.  [¶]  There is nothing that I have been presented. The parents have failed to [show] that anything has changed, and so the home of parent . . . request is denied."

The Department was ordered to provide reunification services.  Mother and father were ordered to submit to random drug tests, and attend a parenting program, a substance abuse awareness program and individual counseling to address the affects of marijuana use on parenting.  Visitation was granted, but only monitored at first.  The Department was given the discretion to liberalize.  Finally, the juvenile court ordered an Evidence Code section 730 evaluation.

This timely appeal followed.

## DISCUSSION

### I.  Standard of Review.

When reviewing a juvenile court's jurisdictional and dispositional orders, we determine whether the orders are supported by substantial evidence.  (*In re I.J.* (2013) 56 Cal.4th 766, 773; *In re Heather A.* (1996) 52 Cal.App.4th 183, 193.)  We look at whether "there is any evidence, contradicted or uncontradicted, which would support the trier of fact's conclusion.  We must resolve all conflicts in favor of the court's determination, and indulge all legitimate inferences to uphold the court's order.  Additionally, we may not

8

substitute our deductions for those of the trier of fact. [Citations.]" (*In re John V.* (1992) 5 Cal.App.4th 1201, 1212.)

"When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the [trial] court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence." (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 451 (*Alexis E.*).)

**II. Jurisdiction.**

Under section 300, subdivision (b), dependency jurisdiction exists if, inter alia, a child has suffered, or there is a substantial risk of the child suffering, serious physical harm or illness as a result of a parent's failure to adequately supervise or protect the child, or a parent's inability to provide regular care for the child due to mental illness, developmental disability or substance abuse.

Mother contends that there is insufficient evidence to support jurisdiction. As discussed below, this contention lacks merit.

A. Substance use; mental illness.

A finding of substance abuse "must be based on evidence sufficient to (1) show that the parent or guardian at issue had been diagnosed as having a current substance abuse problem by a medical professional or (2) establish that the parent or guardian at issue has a current substance abuse problem as defined in the DSM-IV-TR." (*In re Drake M.* (2012) 211 Cal.App.4th 754, 766 (*Drake*).)

As defined, substance abuse is "'[a] maladaptive pattern of substance use leading to clinically significant impairment or distress, as manifested by one (or more) of the following, occurring within a 12-month period: [¶] (1) recurrent substance use resulting in a failure to fulfill major role obligations at work, school, or home (e.g., repeated absences or poor work performance related to substance use; substance-related absences, suspensions, or expulsions from school; neglect of children or household)[; ¶] (2) recurrent substance use in situations in which it is physically hazardous (e.g., driving an automobile or operating a machine when impaired by substance use)[; ¶]

9

(3) recurrent substance-related legal problems (e.g., arrests for substance-related disorderly conduct)[; and ¶] (4) continued substance use despite having persistent or recurrent social or interpersonal problems caused or exacerbated by the effects of the substance (e.g., arguments with spouse about consequences of intoxication, physical fights).' [Citation.]" (*Drake*, *supra*, 211 Cal.App.4th at p. 766.)

We conclude that there was sufficient evidence that mother had a substance abuse problem under the *Drake* test.

Dr. Meza issued a report in which he preliminarily diagnosed mother with cannabis abuse pursuant to DSM-IV, Axis I. His diagnostic impression was based on an interview in which he assessed mother's medical status, employment status, use of drugs and alcohol, her family and social history, her psychiatric status and her daily schedule. Also, she was given a mental health status exam that revealed, inter alia, that she was suspicious, suffered from delusions and had poor memory, inappropriate judgment and rambling speech. Her self-reported daily schedule revealed that mother did not work, and that she would put the minors to bed between 8:00 p.m. and 10:00 p.m. and then "dr[i]nk/g[e]t high." Further, the evidence showed that mother had been using marijuana for four years, she used it during her pregnancies with P.P. and R.P., and the family had been observed in a motel room with cockroaches, holes in the wall and bags of garbage. Also, investigators and examiners discovered that P.P. had matted, flea-infested hair and a small abscess, and R.P. had diaper rash. Both P.P. and R.P. had multiple marks that were likely due to old insect bites. At various times during the investigation, the minors were dirty. P.P. exhibited withdrawn behavior, and R.P. demonstrated a willingness to inflict harm on herself. Prior to the current case, the Department received two referrals regarding the family, and mother was resistant to voluntary services such as drug testing. The evidence and reasonably deducible inferences demonstrate that due to chronic abuse of marijuana, mother neglected the minors and her household for a 12-month period. In addition, mother has had recurrent legal problems with the Department and juvenile court due to her use of marijuana. Taken together, these facts are sufficient to support the

10

juvenile court's finding that mother has a substance abuse problem under at least two of the DSM-IV-TR definitions of substance abuse.

We now turn to the issue of mother's mental illness.

A psychological evaluation is not necessary for a finding of jurisdiction under section 300, subdivision (b) if a parent's mental illness, and the concomitant risk to a child, can be assessed without the aid of an expert. (*Laurie S. v. Superior Court* (1994) 26 Cal.App.4th 195, 202; *In re Khalid H.* (1992) 6 Cal.App.4th 733, 736 ["Since section 300, subdivision (b) does not contain a described formal procedure to determine if a parent suffers from a mental illness, we will not borrow one from another statute" such as section 361.5].) Here, mother's bizarre statements and behavior at the hospital, during in-home visits and at the Department's offices demonstrated mental illness without the necessity of an expert opinion. In any event, that finding was bolstered by Dr. Meza's diagnostic impression. Even though his diagnosis was preliminary, he recommended that mother "participate in . . . mental health therapy services." He saw the need for intervention, and so did the juvenile court. Given the state of the record, we decline to second guess the factual findings.

B. Risk to the minors.

There was substantial evidence that the mother's conduct and/or mental state placed the minors at risk of harm.

A parent's substance abuse does not always support jurisdiction. But when the courts are dealing with the youngest of children, "the finding of substance abuse is prima facie evidence of the inability of a parent or guardian to provide regular care resulting in a substantial risk of physical harm." (*Drake*, *supra*, 211 Cal.App.4th at pp. 766–767.) Because the minors were two years old, one year old and five months old at the time of the jurisdictional hearing, we conclude that mother's substance abuse is sufficient evidence of a risk of harm under *Drake*.

Moreover, the family's motel room smelled like smoke when a social worker made an unannounced visit, and the family was evicted from a motel because they smoked in their room and would not allow the room to be cleaned. There is an inference

11

that mother exposes the minors to the risks of secondhand smoke. This is a sufficient risk upon which jurisdiction may append. (*Alexis E.*, *supra*, 171 Cal.App.4th at p. 452 [after acknowledging that "the mere use of marijuana by a parent will not support a finding of risk," the court found that there was "a risk to the children of the negative effects of secondhand marijuana smoke"].)

Inferentially, the minors were placed at risk of illness or physical injury due to mother's neglect as demonstrated by the fleas in P.P.'s hair, his untreated abscess, R.P.'s diaper rash, the apparent insect bites on P.P. and R.P., the minors' lack of consistent bathing, and the lack of cleanliness in the family home. The risk was exacerbated by the mother's resistance to services and her insistence on smoking medical marijuana despite all the trouble it has caused the family. Further, there is an inference that the behaviors of mother and father have had a deleterious impact on the psychology and development of P.P. and R.P. They have displayed behavior suggesting that they have attachment disorders or are mimicking their parents. Thus, there is a risk of emotional harm as well as illness or physical injury.

## III. Removal of the Minors.

Mother contends that all the dispositional orders should be reversed because there is no basis for jurisdiction. In the alternative, she argues that the juvenile court erred when it removed the minors from her custody because the Department did not offer clear and convincing evidence that there was a substantial danger to the minors in the absence of removal. As a corollary, mother argues that the juvenile court did not make reasonable efforts to keep the family together.

Section 361, subdivision (c) provides that a child may not be taken from the physical custody of his or her parents with whom the child resides at the time a section 300 petition was initiated unless the juvenile court finds by clear and convincing evidence, inter alia, that there "is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical

custody."  (§ 361, subd. (c)(1).)  Prior to opting for removal, a juvenile court must examine other means of protecting a child.  (*In re James T.* (1987) 190 Cal.App.3d 58, 65; *In re Henry V.* (2004) 119 Cal.App.4th 522, 525–531; § 361, subd. (d) ["The court shall make a determination as to whether reasonable efforts were made to prevent or to eliminate the need for removal of the minor from his or her home"].)

As a preliminary matter, we reject mother's suggestion that we review the evidence of danger to the minors through the prism of the clear and convincing standard. She offers *In re Basilio T.* (1992) 4 Cal.App.4th 155, 169, 170 as authority, but it only stated that "'the substantial evidence test applies to determine the existence of the clear and convincing standard of proof. . . .' [Citation.]"  By no means did that case alter the substantial evidence test.  As explained in *In re I.W.* (2009) 180 Cal.App.4th 1517, 1525–1526, "'"The sufficiency of evidence to establish a given fact, where the law requires proof of the fact to be clear and convincing, is primarily a question for the trial court to determine, and if there is substantial evidence to support its conclusion, the determination is not open to review on appeal."'  [Citation.]  Thus, on appeal from a judgment required to be based upon clear and convincing evidence, the clear and convincing test disappears and 'the usual rule of conflicting evidence is applied, giving full effect to the respondent's evidence, however slight, and disregarding the appellant's evidence, however strong.'  [Citation.]"

The juvenile court found that there were no reasonable means of protecting the minors without removing them from the custody of their parents, and this finding was supported by substantial evidence.  Mother has forced the minors to live without proper care, which is dangerous to their welfare and establishes that the family is a dysfunctional one in the need of services.  The family is transient, father has parenting deficiencies, and there is no evidence that there are any friends or family members who can supervise or intervene as needed on a daily basis.  Undeniably, mother has continued to use marijuana despite how it might affect the minors and her ability to care for them, and despite the legal consequences.  Her recalcitrance, in our view, gave the juvenile court little option but removal.

All other issues are moot.

## DISPOSITION

The jurisdictional and dispositional orders are affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, Acting P. J.
     ASHMANN-GERST


We concur:


_____, J.
  CHAVEZ


_____, J.[*]
  FERNS

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

14